**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:13-CV-24583-PAS**

CHRIS P. CARTER,
Individually and on behalf of all
others similarly situated,

     *Plaintiff,*                               CLASS ACTION

v.

FORJAS TAURUS S.A.,
TAURUS INTERNATIONAL
MANUFACTURING, INC., and
TAURUS HOLDINGS, INC.,

     *Defendants.*

_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT, GRANTING MOTION FOR ATTORNEYS' FEES AND
INCENTIVE AWARD, AND OVERRULING OBJECTIONS TO SETTLEMENT**

THIS MATTER is before the Court for final approval of class action settlement. Plaintiff Chris P. Carter ("Plaintiff") has filed a Motion for Final Approval and Supporting Memorandum [DE 147] and Supplement [DE 191], as well as a Motion for Attorneys' Fees and Service Award [DE 148].

The focus of the class action is nine polymer striker-fired Taurus models of firearms alleged to have two defects that cause unintentional discharge when dropped or when the safety is on. The specific models are: PT-111 Millennium; PT-132 Millennium; PT-138 Millennium; PT-140 Millennium; PT-145 Millennium; PT-745 Millennium; PT-24/7; PT-609; and PT-640 (collectively, "Class Pistols"). The Class is comprised of approximately 955,796 members. After two rounds of notice, four individuals opted out and only five individuals filed objections.[1]

---

[1] The objectors include Steven Glaviano [DE 136, 182, 193], Troy Scheffler [DE 137, 185], Terry Pennington [DE 141], Richard Jordan [DE 142, 186], and Michael Reamy [DE 184]. Mr. Glaviano [DE

The parties filed responses to the objections [DE 149, 189] and moved to strike Objector

Glaviano's third (supplemental) objection [DE 194].

Having reviewed the record and the parties' submissions and having held two final

approval hearings with a supplemental notice period in between them, the Court finds that the

Notice complied with due process and, pursuant to Federal Rule of Civil Procedure 23(e), was

the best notice practicable under the circumstances.  The Court further finds that the Class is

properly certified and the Settlement is fair, reasonable, and adequate.  The Settlement was the

product of extensive arm's-length negotiations by experienced counsel; it avoids considerable,

costly, and protracted litigation posing significant obstacles to Plaintiff's success on the merits;

and it provides reasonable and adequate value to the Settlement Class Members.  Finally,

applying the legal standards in this Circuit, the Court finds Plaintiff's request for $9 million in

attorneys' fees and costs and a $15,000 service award for Plaintiff Carter to be reasonable in

light of the circumstances of this case.  Therefore, Plaintiff's Motion for Attorneys' Fees and an

Incentive Award is granted.  Each of the objections is overruled or denied.

### Factual Background

In 2013, Plaintiff was a deputy with the Scott County, Iowa Sherriff's Department.  His

service weapon was a personally-owned Taurus PT140 Millennium PRO pistol.[2]  Plaintiff

alleges that, while pursuing a suspect, his Taurus pistol fell from its holster, dropped to the

ground, and discharged on impact.  After retaining attorney Todd Wheeles, Plaintiff filed his

initial complaint on December 20, 2013.  After several months of discovery, Plaintiff filed his

---

160] and Mr. Scheffler [DE 164] also responded to the Motions for Final Approval and Attorneys' Fees
and attended the January 20, 2016 Final Approval Hearing.  Mr. Glaviano attended the July 18, 2016
Final Approval Hearing.  Dean McAdams also filed a Motion for Return of Property [DE 150], which is
addressed at Footnote 14 below.

[2] A PT140 Millennium PRO is a model of the PT140 Millennium Taurus pistol.

First Amended Complaint on September 22, 2014, asserting statutory, tort, and warranty-based claims arising from alleged safety defects in the Class Pistols.[3]

Specifically, Plaintiff alleges that the Class Pistols contain two defects (collectively "Safety Defects"). [DE 131 (Tr. at 12:19-13:21).] The first is a "drop-fire defect" that Plaintiff alleges may cause the Pistols to fire when dropped from a normal height. Plaintiff contends that the drop-fire defect is a common design defect attributable to the fact that the Class Pistols all lack a "trigger blade safety." The second alleged defect is a "false safety defect" that Plaintiff alleges may allow a Pistol to fire unintentionally even when the manual safety lever is in the "on" or "safe" position and the trigger moves rearward.

While Defendants acknowledge that the Class Pistols lack trigger blade safeties, they deny that this results in the alleged common defects, and they otherwise deny Plaintiff's allegations and claims.[4] As of 2013, the Class Pistols are no longer manufactured and distributed in the United States. [DE 131 (Tr. 13:13-18).]

The parties have zealously litigated this case and conducted extensive document production and other discovery. Brazilian Defendant Forjas Taurus S.A. moved to dismiss based on improper service [DE 30] and later resisted discovery, resulting in a Motion to Compel [DE 101]. Defendants also moved to dismiss for failure to state a claim [DE 79], challenging each of Plaintiff's claims. Plaintiff's counsel has deposed three corporate representatives concerning numerous designated topics. Defendants' counsel has also deposed Plaintiff. In addition, both

---

[3] Capitalized terms not otherwise defined in this Order have the meanings assigned to them in the Settlement Agreement.

[4] At the July 18 Final Approval Hearing, Defendants recognized that several inadequacies on the Class Pistols can combine to contribute to the alleged "drop-fire defect." Defendants are currently investigating whether these inadequacies can be fixed to prevent further unintended discharge and provide a means of repairing the Pistols. Defendants remain firm as to their position that unintended discharge from the alleged "false safety defect" can only occur upon intentional user override of the manual safety.

before and after the case was filed, Plaintiff's experts conducted approximately 500 hours of testing across all Class Pistol models, which the parties described during the June 23, 2015 Preliminary Approval Hearing.  [DE 131 (Tr. at 14:23-19:3).]  Defendants also conducted their own expert testing.

## I.    The Settlement Negotiations.

During discovery, the parties engaged in more than 90 hours of arm's-length mediation and settlement negotiations over the course of several months, including six in-person mediation sessions with mediator Rodney Max of Upchurch Watson White & Max.[5]   These mediation sessions were held in Miami, Birmingham, Fort Lauderdale, Atlanta, and Washington, D.C.  At these sessions, Plaintiff shared his expert testing and opinions regarding the Safety Defects. Defendants thereafter engaged a new team of experts to test the Plaintiff's experts' findings and conclusions. The parties also addressed and debated class certification issues and the strengths and weaknesses of each side's claims and defenses.  In addition to the formal mediation sessions, counsel engaged in extended negotiations, both in person and telephonically.

Defendants' boards of directors rejected the parties' first proposed settlement. Subsequently, the parties participated in a final mediation session in Washington, D.C.  Also in attendance were Plaintiff's forensic accountant, Forjas Taurus's CFO from Brazil, Taurus International Manufacturing, Inc.'s CEO, and a Portuguese translator with Brazilian business experience and a law degree, retained by Plaintiff's counsel specifically to facilitate mediation. That session resulted in a second settlement, which Defendants' boards approved.[6]

---

[5] Mr. Max was a certified class action mediator in this District through 2014.

[6] Since the Settlement was submitted to the Court, Defendants have been investigating the alleged "drop-fire defect" in an effort to determine if a repair is feasible.  Plaintiff has not revised the proposed Settlement but will continue to update Class Members on the status of Defendants' efforts.

## II.     The Proposed Settlement.

The Settlement focuses on nine Taurus firearms alleged to have a "drop-fire defect" and a

"false safety defect."  Based on Defendants' Acquisition and Disposition Records, which are part

of a tracking system approved by the Bureau of Alcohol, Tobacco, and Firearms ("ATF"),

Defendants state that approximately 955,796 Class Pistols have been distributed since each was

first manufactured.  [DE 147-3 (Declaration of Dr. Andrew Safir).]  The breakdown for each

Class Pistol is as follows:

| MODEL | NUMBER DISTRIBUTED |
|---|---|
| PT-111 Millennium | 286,190 |
| PT-132 Millennium | 4,137 |
| PT-138 Millennium | 20,520 |
| PT-140 Millennium | 159,095 |
| PT-145 Millennium | 178,622 |
| PT-745 Millennium | 21,365 |
| PT-609 | 21,037 |
| PT-640 | 5,378 |
| PT-24/7 | 259,452 |
| **TOTAL** | 955,190 |

Because all Class Pistols are subject to the alleged defects, the Settlement Class includes all

present owners of Class Pistols.  Therefore, the Settlement Class is defined to include:

> "All Persons or entities of the United States, Commonwealth of Puerto Rico, U.S.
> Virgin Islands, and Guam who own one or more of the following Taurus-branded
> firearms on the date of preliminary approval: PT-111 Millennium; PT-132
> Millennium; PT-138 Millennium; PT-140 Millennium; PT-145 Millennium; PT-
> 745 Millennium; PT-609; PT-640; and PT-24/7."

[DE 123 at 4.]  State, local or federal governments, bodies, or agencies are excluded from

the Settlement Class.  The Settlement Release expressly excludes claims for death,

personal injury, and damage to property other than to the Pistols.

The proposed Settlement provides Settlement Class Members who elect to return their Class Pistol with two options for relief — either an enhanced warranty or a cash payment. The proposed Settlement also provides online safety training.

*Warranty Enhancement.* Under the first option, Settlement Class Members can choose to receive an enhanced warranty covering their Class Pistols. Defendants have agreed to modify the existing Warranty and Repair Policy for all Class Pistols to allow *any owner* (not just the current or original owner) to return their Class Pistol with a warranty claim *at any time* (for the life of the Pistol) to have the Class Pistol inspected for the alleged Safety Defects and repaired, if possible, or replaced. While Taurus is endeavoring to develop a repair to the alleged "drop-fire defect," there is no repair currently available [DE 147 at 4 n.4]. Therefore, Class Members who choose the enhanced warranty option will receive a comparable model G2 pistol, which is fitted with a trigger blade safety. Plaintiff's experts tested the replacement G2 model pistols to ensure they do not suffer from the same defects alleged in this litigation. [DE 147 at 4 n.3]

As part of this enhanced warranty, Defendants are waiving all their standard inspection fees and labor charges, including their minimum charge of approximately $35.00 normally associated with their existing Warranty and Repair Policy. Owners will also not have to prove their returned Pistol is defective or has experienced any unintended discharge.[7]

Defendants will also pay shipping costs to and from their designated warranty facility in Miami.[8] Because FedEx requires all firearms to be shipped "Express Standard Overnight," the shipping costs average $64.85, depending on origin. [DE 147-3 (Declaration of Dr. Andrew Safir at 13-14).] FedEx agreed to waive the standard 30-day expiration of their shipping labels

---

[7] The Defendants' Chief Customer Service Representative testified that the Class Pistols would not have been replaced based on drop-fire concerns under the previous warranty. [*See* DE 149-1 (K. Intagliata Dep., Apr. 7, 2015, 255-56).]

[8] The existing warranty covers only shipping from the warranty facility if repairs are necessary.

and to dispatch a FedEx employee to transport each Class Pistol. However, as a result, the Claims Administrator was unable to negotiate any shipping rate discounts. [DE 168 (Hr'g Tr. 56:15-24).] Taurus will destroy all returned Class Pistols in accordance with ATF regulations.

*Cash Payments.* Alternatively, Settlement Class Members may elect to return their Class Pistols to Defendants during the *four-month* claims period in exchange for a cash payment. The four-month claims period will begin to run 30 days from the conclusion of any appellate process. The payments will be based on the following schedule:

a) if less than 10,000 Class Pistols are returned, the payment for each returned Class Pistol will be $200;

b) if between 10,001 and 20,000 Class Pistols are returned, the payment for each returned Class Pistol will be $175;

c) if between 20,001 and 200,000 Class Pistols are returned, the payment for each returned Class Pistol will be $150; and

d) if more than 200,000 Class Pistols are returned, the payment for each returned Class Pistol will be less than $150 and will be equal to $30 Million divided by the number of Class Pistols returned.

To receive this benefit, Class Members must submit a two-page claim form, attached to this Order as Attachment A. Payments will be made on a weighted average so that all Class Pistols returned will be paid out at the same value. The maximum liability for the cash payments benefit is capped at $30 million. The only amounts included in the calculation of the $30 million cap are the cash payments made to Settlement Class Members. None of the other Settlement benefits, Class Counsel's fees and expenses, incentive fee, or claims administration expenses are included in the $30 million cap. The parties estimate that the cap will be reached only if more than 25% of all Settlement Class Members elect the cash payment option.

*Safety Training.* Finally, Defendants have produced and made available to Settlement Class Members special and particularized safety training videos addressing the alleged Safety Defects and the operation and handling of the Class Pistols. The videos are available online at [https://www.tauruscartersettlement.com/safetytrainingvideo/] and at

[http://www.taurususa.com/] under the News Link titled "Class Action Settlement." This safety training addresses proper handling and carrying to avoid dropping a pistol; educates owners concerning the safety features and safety systems in the Class Pistols; and provides information and instructions on how to properly store, pack, and ship the Class Pistols for return to Defendants (should the Settlement Class Member elect to ship a Class Pistol for warranty replacement/repairs or payments). The purpose of the safety training is to make Settlement Class Members aware of the specific alleged Safety Defects and to enhance safe use of the product.

*Settlement Value.* The parties' valuation expert Dr. Andrew Safir estimated the total value of the Settlement if every Class Member were to make a claim to be $239 million. [DE 169-1.] Assuming only a more conservative 10-25% overall claim rate based on the amount of media exposure, public awareness of the defects, ease in making a claim, and lifetime duration of the enhanced warranty, Dr. Safir estimated that the Settlement value ranges from $29.9-$73.6 million, excluding claims administration and attorneys' fees, which Defendants will pay separately from the Class recovery. [DE 147-3 (Declaration of Dr. Andrew Safir).] Specifically, Dr. Safir determined that the value of the enhanced warranty is between $20.9-52.3 million. In reaching this figure, he included the average shipping costs of $64.85 to and from the customer and estimated the weighted average value of the replacement firearms to be $235. He excluded the incidental repair costs, such as the $35 labor fee, because no repair currently exists. As to the cash payout, Dr. Safir estimates a $9.0-21.3 million value, which includes an estimated $158-170 per customer payout and one-way shipping for purposes of returning the Class Pistol.

*Attorneys' Fees and Incentive Payment.* Separate and apart from Class recovery, the parties also agreed that Defendants would pay up to $9 million in attorneys' fees to Class Counsel and a $15,000 incentive fee to Plaintiff, if approved by the Court. [DE 148 at 1.] The

attorneys' fees will be paid in equal $3 million installments over a three-year period, beginning one year after the Effective Date and paid annually thereafter.[9] *Id.*

  ***Claims Administration.***  Pursuant to the Settlement Agreement, all costs of providing notice to the Settlement Class, processing Claim Forms, making settlement payments, and otherwise administering the Settlement will be paid by Defendants separate and apart from the Class Members' benefits under the Settlement.  These costs are estimated to be $1.5-2 million. [DE 191-1 (Declaration of Jeanne C. Finegan) at 3.]

**Procedural Background**

  At the Preliminary Approval Hearing on June 23, 2015, the Court considered the factual and legal basis for the parties' claims and the Settlement terms including the extensive experience of the Claims Administrator Jeanne Finegan of Heffler Claims Group.  Ms. Finegan also described the notice program she developed.  Based on the parties' submissions, the Court preliminarily approved the Settlement, appointed Plaintiff as Class Representative and his counsel as Class Counsel, appointed Heffler Claims Group as Claims Administrator, and certified the proposed class.  [DE 133.]  Because there is no national firearm registry, and the Settlement applies to present owners and not purchasers, the Court approved the parties' notice program, which involved extensive publication notice through national periodicals and popular internet outlets.  A Final Approval Hearing was held on January 20, 2016.  Only four individuals, Steven Glaviano [DE 136], Troy Scheffler [DE 137], Terry Pennington [DE 141], and Richard Jordon [DE 142], timely objected during the notice period, and no one opted out.  A fifth individual, Dean McAdams later filed a letter raising the additional issue of state law restrictions on shipment of Taurus pistols into certain states.  [DE 150.]

---

[9] Class Counsel's estimate of the net present value of this payment is $8,520,704.61.  The net present value was calculated using Class Counsel's 2.78% Cost of Capital.  [DE 148, Ex. C (Selby Decl. at ¶ 10).]

Based on some of the Objectors' concerns that arose during the January 20, 2016 Final Approval Hearing, the Court continued the hearing to July 18, 2016, to allow for a sufficient re-notice period.  The Supplemental Notice was approved [DE-175] and the Website was updated to: (1) emphasize that under the enhanced warranty Class Members would receive a comparable G2 model; (2) warn Class Members of possible state and county law shipment restrictions on Taurus pistols; and (3) amend the Release to clarify that it related only to the claims in this case. Four individuals opted-out of the Class Settlement during the re-notice period. [DE 192.]  One additional individual, Michael Reamy [DE 184], filed an objection during the re-notice period. Mr. Glaviano [DE 182, 193], Mr. Scheffler [DE 185], and Mr. Jordan [DE 186], filed supplemental objections.

## Analysis

### I.      The Class Received Adequate Notice.

There is no national firearms registry and Taurus sale records do not provide the names of the ultimate purchasers—only the approximately 50 distributors that Taurus sells to directly. Thus, the form and method used for notifying Class Members of the terms of the Settlement was the best notice practicable under the circumstances, and satisfied the requirements of Federal Rule of Civil Procedure 23(c)(2)(B), the Class Action Fairness Act of 2005, codified at 28 U.S.C. § 1715, and due process.  The court-approved notice plan and supplemental notice plan used peer-accepted national research methods to identify the optimal traditional, online, mobile and social media platforms to reach the Settlement Class Members.  They involved five components:  widespread publication notice, a press release, internet advertising, a settlement website, and a toll-free number, with the option of speaking to a live operator.  The Administrator also served the attorneys general of each of the fifty United States, the United States Attorney General, the acting ATF Director, and other required officials by First Class

Certified U.S Mail with notice and supplemental notice of the proposed Settlement, pursuant to 28 U.S.C. §1715.  [DE 147-4 (Declaration of Jeanne C. Finegan) at 5; DE 191-1 (Declaration of Jeanne C. Finegan) at 5.]

### A.  *The Notice Program was the Best Practicable and was Reasonably Calculated to Inform Class Members of Their Rights.*

For the first round of notice, a Court-approved Summary Notice was published in national magazines, such as the NRA'S *American Rifleman*, *Guns & Ammo*, *Field & Stream*, *Sports Illustrated*, and *People*, and general circulation newspapers in the U.S. Territories. [10]  [DE 147-4 (Declaration of Jeanne C. Finegan) at 9-10.]  Among other things, it defined the Settlement Class; described key terms of the Settlement Agreement; informed Class Members of their right to opt out and object as well as the procedures and deadline for doing so; identified the Claims Administrator; highlighted Class Counsel's $9 million fee request and Plaintiff's $15,000 incentive award; and directed readers to the Settlement Website and toll-free number.  Given that reliable market research showed most handgun owners are online, banner advertisements were purchased on various websites designed to reach the Class Members, including social media websites.  [DE 147-4 (Declaration of Jeanne C. Finegan) at 10-11.]  These banner ads linked to a website where Class Members could obtain further information about the settlement, their rights, and other relevant information.  [DE 147-4 (Declaration of Jeanne C. Finegan) at 12.]  Finally, a multimedia news release was issued over PR Newswire's US1 newsline on October 13, 2015.  [DE 147-4 (Declaration of Jeanne C. Finegan) at 11.]  Based on these efforts, the Settlement was

---

[10] Both the notice and supplemental notice were published in seven print magazines, including *People Magazine* (with an estimated circulation of 3,537,318), *Athlon Sports* (9,250,968), *American Rifleman* (2,094,346), *Field & Stream* (1,263,157), *Sports Illustrated* (3,021,065), *National Geographic* (3,538,623), and *Guns & Ammo* (420,645).  Both notices were also published in four newspapers circulated throughout various U.S. Territories, such as *The Guam Pacific Daily News* (20,000), *The Puerto Rico El Vocero* (229,685), *The San Juan Daily News* (50,000), and *The U.S. Virgin Islands Daily News* (13,343).  [DE 191-1 (Declaration of Jeanne C. Finegan) at 6-9.]

picked up by mainstream television and newspaper websites, blogs, and social media. [DE 147-4 (Declaration of Jeanne C. Finegan) Ex. H & I.] Heffler advised that this round of notice reached 86% of the target audience with an average frequency of five times. [DE 147-4 (Declaration of Jeanne C. Finegan) at 1.]

The supplemental notice used the same methodologies employed in the first round of notice. Heffler advised that the supplemental notice reached 83% of the target audience with an average frequency of three times. [DE 191-1 (Declaration of Jeanne C. Finegan) at 2.]

### B. The Objections to the Notice Program are Overruled.

The various objections as to the manner of this notice program[11] are contradictory and based on erroneous knowledge. Mr. Glaviano [DE 136 at 28; DE 160 at 4-6] maintains that actual and individual notice should have been required because Taurus had internal databases — product enrollment forms, NRA membership promotions, and repair-customers' email addresses — through which he claims it could have identified Class Members. Meanwhile, Mr. Scheffler [DE 137 at 2; 185 at 10] objects that, since gun registration is rarely mandatory, individual notice is impossible and the class should be decertified. Mr. Reamy separately states that the parties' reliance "only on social media" was simply inadequate. [DE 184 at 1.]

Heffler's notice program was the best notice practicable under the circumstances. Neither due process nor Rule 23 requires that class members receive actual notice, and publication notice is appropriate where class members' names and addresses cannot be determined with reasonable efforts. *See Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012). As Mr. Scheffler contends, individual notice is impracticable in this case. The Settlement Class includes *owners*, not just purchasers; the parties have represented that Taurus

---

[11] There were no objections to the credentials of Ms. Finegan or Heffler.

has "no current and reliable records"[12] of Class Pistol owners [DE 149 at 8]; and there is no national registry of gun owners. Furthermore, the time and effort to have Taurus staff put together a list of Class Pistol owners who have contacted Taurus would be grossly out of proportion to the negligible few Class Members located. Under such circumstances, courts have held that publication notice — not decertification — is appropriate. *See Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676-77 (7th Cir. 2013) (holding that notice by publication was adequate where the individual class members could not be identified with reasonable effort); *see also Poertner v. Gillette Co.*, 618 F. App'x 624, 630 (11th Cir. 2015) ("But even if it was possible to identify *some* unnamed class members, that does not mean that the district court lacked the discretion to approve the settlement as fair absent the identification of these class members.").

The extensive, two-round notice campaign used in this case over the course of eight months, included over 535 news mentions, 9,921 social media engagements, and over 552,808 visits to the Settlement Website. [DE 191-1 (Declaration of Jeanne C. Finegan) at 11-13.] The first round notice had an estimated reach of 86% of the target audience, while the supplemental notice reached an estimated 83% of the target audience.[13] Therefore, the scope of the notice program was adequate.

---

[12] Taurus sold the Class Pistols to approximately 50 approved distributors, which, in turn, sold the weapons to retailers. These retailers sold the Class Pistols to the ultimate purchaser. Taurus itself has no records of the ultimate purchaser or any subsequent purchasers. Nor is there any easy way for Taurus to gather a list of current owners.

[13] Mr. Scheffler's challenges to the veracity of this figure and the overall adequacy of the notice program are conclusory and anecdotal. For instance, he states he came across news of the Settlement only "by happenstance," because he had seen an article about the lawsuit and "[m]onths later" decided to "follow up," although he does not describe how or with whom [DE 137, 162, 164, 185]. That he was able to learn about the Settlement, timely object, and appear at the January 20, 2016 Hearing indicate that, however he discovered the news, all necessary details were easy to find and comprehensible. His additional allegations that the Claims Administrator developed the notice program based on "junk science" and that "banner ads" are "unpredictable" and may "contain links to malicious webpages" lack evidentiary support.

Objectors also argue that the content of the notice was insufficient because it failed to alert Class Members that under the enhanced warranty they would be receiving a replacement G2 model rather than a repair [DE 141 at 4; DE 184 at 1], and failed to consider state law shipment restrictions [DE 150]. In light of the Supplemental Notice, those objections are now moot.[14] Mr. Reamy further objects to the notice's failure to inform Class Members that the caliber of their Class Pistol and the replacement pistol may be different. This objection is meritless as the notice now clearly explains that "[c]ertain calibers of the Class Pistol models are not available in Taurus G2 model pistols." Finally, he argues that the notice fails to explain the price discrepancy between the Class Pistol and its replacement. However, Mr. Reamy's alleged price discrepancy is unsupported speculation. He offers no details as to his calculations. Dr. Safir, on the other hand, concluded that replacing a used and potentially defective Pistol with a new G2 model would confer an average of $235 in value on the Class Member.

Combined, the two rounds of notice across traditional, online, mobile, and social media platforms adequately informed Class Members of the key Settlement terms and contained information reasonably necessary to allow them to decide both whether to remain in the class and, if so, which benefit to choose.[15] It also informed the Settlement Class that Class Counsel would be seeking up to $9 million in fees and an incentive award of up to $15,000 for the named

---

[14] Alerting the Court to possible shipment restrictions on Taurus pistols into California, Mr. McAdams requests that the Court order Defendants to send G2 replacements to Class Members in states subject to such restrictions and simply disregard state law. [DE 150.] His motion must be denied. The law does not allow parties to agree nor the Court to approve a settlement with terms that violate valid state law unless those terms are necessary to correct a violation of federal law. *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995); *see also Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997). Mr. McAdams alleges no federal law violation.

[15] Mr. Reamy inaccurately asserts that the notice program focused solely on social media platforms.

Plaintiff, to be paid separately from Class recovery.  *See In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1342 (S.D. Fla. 2011).[16]

## II.   The Proposed Settlement Class is Certified.

The Court previously found the requirements of Rule 23(a) and (b)(3) satisfied in this case.  [DE 133.]  Only two Objectors challenged this determination, arguing without any factual or legal support that the Class fails to meet Rule 23's requirements and expressing general discontent with the Settlement.  Mr. Scheffler believes that Members are reluctant to disclose their ownership of a firearm and therefore refuse to opt out of the Class, citing private conversations with unknown individuals who were asked whether they would "notify a branch of the Federal Government that [they] owned a firearm and give them the serial number in a public forum." [DE 164 at 1-2.]  Mr. Scheffler's argument is unpersuasive because it rests on anonymous answers to an incomplete and misleading question.  He makes no mention of the potential safety risks involved in this case or the potential benefits provided by Class Settlement.  Moreover, Defendants have explained that the serial numbers will only be used to determine which Class Pistols have been removed from circulation. [DE 168 (Hr'g Tr. 63:9-14).]

Mr. Glaviano objects that the named Plaintiff lacks standing because he did not purchase his weapon and that commonality is not met and subclasses are needed because there are nine Class Pistol models which differ in design and value. [DE 136 at 29; DE 182 at 23.]  He also

---

[16] Objector Pennington contends that Rule 23(h) requires that the Class Members be able to review the Motion for Attorneys' Fees prior to the objection deadline [DE 141 at 5].  He points to no legal authority in support of his position.  In any event, Class Counsel filed its fees motion by January 6, 2016 — seeking the same amount disclosed in the Notice — two weeks before the January 20, 2016 Final Approval Hearing, which provided Objectors sufficient time to respond [*see e.g.*, DE 160, 162].  Moreover, the re-notice period gave Class Members an additional six months to respond to the fees motion.

argues that the Class Pistols are not defective based on his own safety tests[17] [DE 160 at 13] as well as records showing that all Class Pistols passed California's "drop test" [DE 182 at 6].

These conclusory objections are without merit. Plaintiff has standing because he is the current owner of a Class Pistol, which suffers the same alleged defects as each Class Pistol model. [DE 133 at 7.] Furthermore, Mr. Glaviano's conclusions about the Class Pistols based on his personal tests are not reliable. He offers no details as to his qualifications as a weapons expert or the conditions and procedures under which he tested his Pistols. Thus, the Court cannot analyze his tests' reliability. Class Counsel has devoted significant time and expense testing the alleged defects with engineering and firearm experts from three different states. [DE 123 at 99.] These experts tested dozens of exemplar pistols using methods specifically designed to address Plaintiff's allegations. Defendants were also preparing to present expert testimony. Ultimately however, both parties determined "that it is in the best interest of the proposed Settlement Class to enter into a fair, reasonable and adequate settlement." [DE 123 at 4.]

Moreover, commonality and predominance are met because each of Plaintiff's claims center on Defendants' common conduct and the Class Pistols' common issues. Specifically, Plaintiff alleges that the Class Pistols suffer from common defects attributable to their collective lack of a trigger blade safety, resulting in a common injury—loss in value of the Pistols—and that Defendants engaged in a common course of conduct—namely, that they knew about but failed to disclose the alleged defects, owed various duties to consumers, and breached common warranties. Nor do differences in value across the nine Class Pistol models defeat class certification. *Brown v. Electrolux Home Products, Inc.,* 817 F.3d 1225, 1239 (11th Cir. 2016) (noting that even the need for individualized damage calculations does not preclude certification

---

[17] Interestingly, Mr. Glaviano's tests revealed two instances where a Class Pistol exhibited the "false safety" condition. [DE 160 at 14.] While Mr. Glaviano claims that the Class Pistols are not defective, his own tests reveal a 14 percent "false safety" rate.

under Rule 23(b)(3)).  Thus, commonality and predominance are satisfied.  *See Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357-58 (11th Cir. 2009) (in deciding whether common issues predominate under Rule 23(b)(3), the focus is generally on whether there are common liability issues that may be resolved on a class-wide basis).

Accordingly, the Settlement Class is certifiable and certified.

### III.   The Settlement is Fair, Reasonable, and Adequate.

To approve a settlement under Federal Rule of Civil Procedure 23(e), the Court must find that it is "fair, reasonable, and adequate" and "not the product of collusion."  *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1217 (11th Cir. 2012).  This inquiry is guided by judicial policies that favor the pretrial settlement of class actions.  *See In re U.S. Oil and Gas Litigation*, 967 F.2d 489, 493 (11th Cir. 1992).  The Eleventh Circuit has identified six factors to consider in making this determination under Rule 23(e):  (1) the stage of proceedings at which the settlement was achieved; (2) the anticipated complexity, expense, and duration of litigation; (3) the likelihood of success at trial; (4) the range of possible recovery; (5) the range of possible recovery at which a settlement is fair, adequate, and reasonable; and (6) the opposition to the settlement.  *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011).  Each factor is satisfied here.

### A.  There Was No Fraud or Collusion.

The Settlement was the product of extensive arm's-length negotiations by experienced counsel on both sides after multiple mediation sessions spanning several months.  Prior to these negotiations, this case had been adversarial.  The parties litigated for over a year and demonstrated their commitment to their respective positions.  Plaintiff conducted over 500 hours of expert testing and deposed several of Defendants' corporate witnesses.  Brazilian Defendant Forjas Taurus S.A. first resisted service and later discovery, resulting in a motion to compel and two motions to dismiss, the second of which challenged each of Plaintiff's claims and was

17

withdrawn only upon settlement.  Clearly, the Settlement was not the result of fraud or collusion. *See, e.g.*, *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (recognizing the adversarial nature of the case and the "high level of contention" between the parties).

### B.  *The Record was Sufficiently Developed to Enable the Parties to Reach a Reasoned Settlement.*

This case was filed in 2013.  Since then, Defendants deposed Plaintiff and produced 24,000 pages of documents.  Plaintiff took depositions of three Taurus 30(b)(6) witnesses, issued fifteen FOIA requests and Rule 45 subpoenas, briefed their opposition to Defendants' Motion to Dismiss, and conducted 500 hours of expert testing with 3 engineering and firearms experts, the results of which they shared at mediation.  [DE 123 at 99-100.]  Thus the parties are at a proper junction with sufficient information to settle this action.

### C.  *Plaintiff Faced Significant Risks in Litigating His Claims.*

Class Counsel recognized that Plaintiff faced major risks and uncertainty in obtaining relief in this litigation—on the merits, in certifying a class, and collecting a judgment against a foreign company.  In Defendants' second Motion to Dismiss [DE 79], Defendants identified substantive issues plaguing any no-injury products liability case, including (1) that the economic loss rule barred Plaintiff's fraud, strict liability, and negligence claims, (2) lack of standing as to some or all of the claims because any injury beyond the loss in value of Plaintiff's pistol was speculative, and (3) that Plaintiff lacked privity to bring his implied warranty claims.  As identified at the Preliminary Approval Hearing, Plaintiff also faced various impediments potentially preventing certification of a nationwide or even state-wide class.  These included choice-of-law and other manageability issues, including privity and notice.  At trial, Plaintiff would have faced additional complex technical and legal issues, including proving that the Class Pistols suffered from a design defect and Defendants' knowledge of such defects.  Given these uncertainties, the parties have good cause to settle this matter.

### D. *The Settlement Will Avoid Years of Complex, Expensive, and Uncertain Litigation.*

In addition to the obstacles Plaintiff would face in succeeding on the merits, recovery by any other means than settlement would take years of additional litigation in this Court and appellate courts, possibly including interlocutory appeal, summary judgment, trial, post-trial motions, and post-judgment appeal. Even assuming Plaintiff ultimately obtained a judgment, Plaintiff would likely encounter difficulties collecting that judgment from a foreign defendant— one that has already indicated its resistance to being bound by U.S. legal procedures—resulting in additional delay and expense.

### E. *The Range of Possible Recovery*

This case involves only the loss in value of the Class Pistols; claims for death, personal injury and damage to other property are expressly excluded in the Release. As a result, the range of possible recovery is from nothing up to the purchase price of the Class Pistols (ranging from approximately $400 to $600 dollars). [DE 147 at 13-14 & n.7.]

### F. *The Benefits to the Class are Significant Considering the Risks of Litigation.*

"In ascertaining whether a settlement falls 'within the range of possible approval,' courts will compare the settlement amount to the relief the class could expect to recover at trial." Newberg on Class Actions § 13:15 (5th ed.). "[T]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) *aff'd sub nom. Behrens v. Wometco Enters.*, 899 F.2d 21 (11th Cir. 1990). This is because settlements must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003). As discussed, Plaintiff faced significant hurdles on the merits of each of his claims, in certifying a class, and in collecting any judgment. No amount of recovery would be guaranteed by litigating these claims through trial.

Relative to the challenges and uncertainty that lay ahead for Plaintiff in litigating this case, the Settlement provides the Class with substantial and immediate recovery. Under the Settlement's enhanced warranty option, the replacement G2 pistols have an average value of $235 over and above the current price of each Class Pistol. [DE 147-3 (Declaration of Dr. Andrew Safir) at13-14).] Moreover, this option has no expiration date, meaning Class Members may avail themselves of it at any time in the future. Recovery under the cash payment option will be paid on a weighted average and depends on the number of claims submitted. It could be as much as $200 and as little as $30 per Class Pistol, if every Class Member chose this option. Considering the four-month duration of the claims period and Class Members' reported preference for the enhanced warranty option, Dr. Safir estimates that Class Members who elect this option will receive between $158-170. [DE 147-3 (Declaration of Dr. Andrew Safir) at 10, 17).] This Settlement thus falls within the range of possible approval. *See Gevaerts v. TD Bank*, No. 1:14-CV-20744-RLR, 2015 WL 6751061, at *1 (S.D. Fla. Nov. 5, 2015) (finally approving a class settlement and finding a $20 million common fund fair and adequate recovery despite estimated losses of $200 million).

### G. *The Opposition to the Settlement is Minimal.*

Despite the fact that the parties estimate nearly one million Class Members, only five individuals objected and only four opted out. Such a low number of objections suggests that the settlement is reasonable. *See Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 694 (S.D. Fla. 2014).

### IV.    All Objections to the Settlement's Fairness, Reasonableness and Adequacy are Overruled.

The Objectors' criticisms of the Settlement consider none of the factors above; in fact, they cite very little legal authority. Instead, the crux of all Objections is that the Objectors seek a more lucrative deal with different terms, such as a recall and admission of liability. Some

Objectors also take issue with specific Settlement terms and procedures, while one Objector contends the Settlement violates the Second Amendment.  All of the Objections fail.

### A. *The Settlement Value is Not Insufficient.*

All five Objectors complain that, whether they opt for the cash payout or the replacement pistols under the enhanced warranty, they would receive less than the full purchase price of the Class Pistols.  Mr. Glaviano also claims that the G2 replacement model is inferior and that Class Members should be reimbursed for gun-specific accessories, including magazines, which may or may not be of Taurus manufacture.  Defendants argue in response that such accessories are limited in type and number given the "all in one" nature of the polymer striker-fired Class Pistols.  Thus, because the Settlement is focused on the alleged defective Class Pistols alone, the accessory issue is outside the relevant scope; and, given the nature of the Class Pistols, the issue is also de minimus.

Moreover, the essence of settlement is compromise.  *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  Here, the Settlement is focused solely on the weapon that is alleged defective from a significant safety perspective.  Taurus is offering up to $30 million in cash payments and a repair/replacement scheme for all owners who choose to dispose of this potential safety hazard.  An unsupported belief that a better deal could be possible is not a basis to overturn a settlement.  *See Behrens*, 118 F.R.D. at 542 ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery.").

The Objectors incorrectly focus on their perceived losses, without considering the benefits to the Class[18] and the significant savings in cost, time, and uncertainty.  Litigating the claims in this case through class certification and trial would be contentious, time consuming,

---

[18] Mr. Pennington argues that the Settlement is overvalued because the safety training videos are worthless. [DE 141 at 4.]  Regardless of the value of the videos, or lack thereof, Dr. Safir did not include them in his Settlement valuation.  Mr. Pennington's Objection is overruled.

and success in obtaining and collecting any judgment is far from certain.  Moreover, if no class were certified, the value of any one claim against Taurus would likely be insufficient to incentivize individual lawsuits, because recovery would be overborne by litigation costs.  Indeed, at the January 20, 2016 Hearing, Mr. Glaviano — a law school graduate — recounted that Taurus had not returned a pistol he had sent in for unrelated repairs but he decided to "eat [the loss]," because he determined that bringing a lawsuit for a "$500 pistol" was not worth it. [DE 131 (Hr'g Tr. 48:5-25).]  Finally, beyond Mr. Glaviano's conclusory allegations that his pistol is superior and should be repaired rather than replaced with a G2 model, the only basis for his claims are unverified citations to anonymous web postings.  Accordingly, all Objections to the Settlement's value are overruled.[19]

### B. No Admission of Liability is Required.

Two Objectors take issue with Defendants' lack of admitted liability in this matter.  Mr. Scheffler [DE 137 at 2] and Mr. Pennington [DE 141 at 4] argue that without an admission of liability, Class Members have little incentive to return their Pistols.  However, an admission of wrongdoing is not required for settlement approval.  Indeed, "[i]t would defeat an important purpose of settlement, and therefore render settlements less attractive to the parties, if the settlement agreement were required to include admissions of wrongdoing by the defendants[.]"  *Alliance To End Repression v. City of Chicago*, 561 F.Supp. 537, 554 (N.D. Ill. 1982).  Moreover, the parties' notice campaign has clearly identified the two alleged Safety Defects at issue—the "drop fire defect" and the "false safety defect."  Class Members who feel unsafe owning a Class Pistol can have it replaced or repurchased under the terms of the Settlement.

---

[19] Although there were no challenges to Dr. Safir's calculations, Mr. Glaviano objected that he is not a gun expert and thus improperly valued the Class Pistols.  However, Dr. Safir is an economics expert and he detailed in his Declaration [DE 147-3] and at the January 20, 2016 Hearing how he priced the Class Pistols in forming his opinions.

### C. *The Release is Not Overbroad.*

Because some Objectors read the Release expansively, they believed it was overbroad and argued that it should be limited to claims relating to the absence of a trigger blade safety. To allay their concerns, the parties modified the Release language to clarify that it applies only to claims relating to or arising out of "the design and manufacturing of the Class Pistols . . . that may result in an unintended discharge," which is the focus of Plaintiff's complaint. [DE 174-3.][20] Taurus discontinued manufacturing the Class Pistols in 2013. Most importantly, the Release expressly and clearly excludes claims for death, personal injury, and property damage other than to the Pistols themselves. Thus, contrary to Mr. Pennington's belief [DE 141 at 2], the Release by its terms does not cover future *conduct*.[21] In exchange for this release, the Settlement provides the consideration as discussed above. *See In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1352. Thus, in light of the modified Release language, the Court finds that the Release is appropriately tailored to the claims relating to or arising out of the Safety Defects alleged in this case and that the Objectors' concerns are moot.[22]

### D. *There were No Side Deals.*

Mr. Glaviano alleges an undisclosed side deal with a company called Risk Settlements, based on his receipt of a LinkedIn request from that company after he sent his Objections to the parties but before they were entered in the record. [DE 160 at 12-13; DE 182 at 8-14.] At the

---

[20] Mr. Glaviano argues that the introductory sentence of the revised Release is still overbroad. However, his reading of the Release can only occur if the first sentence is read in isolation. The first sentence is tailored by the revised language cited above. His objection is overruled.

[21] To the extent the Release waives future claims relating to the Safety Defects, such releases are regularly approved. *See Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 471 & n.10 (S.D. Fla. 2002).

[22] Although Mr. Pennington objects, again without legal authority, that the Release should be limited to the "claims certified for class treatment" and that the "specific statutory or common law claims to be released should be spelled out" [DE 141 at 2], this specificity is not required. *See In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1352 (S.D. Fla. 2011).

January 20, 2016 Hearing, the parties explained that Risk Settlements provides consulting and insurance services in connection with class action settlements, and that Taurus had used them as a consultant in this case. [DE 168 (Hr'g Tr. 54:7-12).] However, the parties further represented that Plaintiff had never consulted with that company, and there was no side deal; in fact, Risk Settlements was neither involved in settlement negotiations, nor did it know about the Settlement. [DE 168 (Hr'g Tr. 54:4-22).] Mr. Glaviano's objection is overruled.

Mr. Glaviano also suggests that Defendants have negotiated an increased shipping rate with FedEx so as to increase the value of the Settlement for purposes of a larger attorneys' fee award. [DE 182 at 14-16.] However his suggestion is based on his speculation alone. At the January 20, 2016 Hearing, the Claims Administrator explained that FedEx requires individuals to ship firearms via overnight air. [DE 168 (Hr'g Tr. 55:9-11).] Furthermore, FedEx has agreed to waive the expiration of their shipping labels and to have each Pistol picked up by a FedEx employee. The Claims Administrator represented that these provisions have contributed to the increased costs. [DE 168 (Hr'g Tr. 56:14-24).] While Mr. Glaviano claims that he has previously returned pistols at a cheaper rate, he offers no connection between the parties' negotiated shipping costs and attorneys' fees. His objection is overruled.

### E. The Selection of a Single Opt Out and Objection Deadline is Not Onerous.

Mr. Glaviano objected that the opt out and objection deadlines were set for the same day. However, it is well-established that "class members may either object or opt out, but they cannot do both." Newberg on Class Actions § 13:23 (5th ed.). Therefore, there is no prejudice in the fact that the Class Members had to choose whether to opt out or object by the same deadline.

### F. The Settlement is Not an End-Run Around the Existing Warranty.

Mr. Glaviano contends that the Settlement's description of the "enhanced" warranty benefit is disingenuous, because it is his belief the alleged defects would have been covered by

the original warranty.  In his view, the Settlement results in a loss of repair rights under the original warranty because Taurus has discontinued "normal warranty repair work, unrelated to the alleged defect." [DE 136 at 12-13.]  Mr. Scheffler filed a similar objection during the re-notice period.  [DE 185 at 3.]

These Objections have no factual or legal merit.  Taurus's Chief Customer Service Representative testified at her deposition that the alleged defects at issue in this lawsuit would not have been covered by the original warranty.  [DE 149-1 (K. Intagliata Dep. Apr. 7, 2015, 255-56).]  Moreover, as discussed, there is no evidence of any fraud or collusion.  If, as Mr. Glaviano claims, Taurus has ceased repairing the Class Pistols and discontinued replacement parts, such actions are logical consequences of Taurus's 2013 decision to cease manufacturing the Class Pistols.  It does not diminish the fairness and adequacy of the Settlement.  To the contrary, regardless of the repair he needs, Mr. Glaviano can turn in his Class Pistol for a cash payment[23] or a replacement without having to prove it has any of the Safety Defects.

### G. The Settlement is Not Unconstitutional.

Mr. Glaviano argues that the Enhanced Warranty Option is unconstitutional because it requires Class Members to surrender their firearm in violation of the Second Amendment.  The Enhanced Warranty does not *require* any action on the part of Class Members.  Indeed, no Settlement term negotiated between the parties requires any action on the part of Class Members.  While Class Members have the *option* to return their Class Pistol for cash payment or a replacement pistol, Class Members are also free to keep their Pistol as if this settlement never took place.  The objection is overruled.

---

[23] Mr. Pennington complains that the notice does not adequately specify the length of the claims period. [DE 141 at 3.]  In light of the Supplemental Notice, which clearly provides for a 120-day claims period, his objection is moot.

## V.      Class Counsel's Motion for Attorneys' Fees is Granted.

Class Counsel requests an award of $9 million in attorneys' fees and costs, to be paid separately by Defendants over a period of three years. [DE 148 at 1-2.]  In this Circuit, attorneys' fees in "common fund cases" are to be based upon "a reasonable percentage of the fund established" for the class.  *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991).  Such an approach is appropriate even if the attorneys' fees are to be paid by the defendant separate from the common fund. *Wilson v. EverBank*, 2016 WL 457011, at *13 (S.D. Fla. Feb. 3, 2016) (citing *David v. American Suzuki Motor Corp.*, 2010 WL 1628362, at *n.14 (S.D. Fla. Apr. 15, 2010)).  The Eleventh Circuit has recently applied this percentage-based approach to "claims-made settlements," noting that a "claims-made settlement is … the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant." *Poertner v. Gillette Co.* 618 Fed. Appx. 624, 628 n. 2 (11th Cir. 2015) (citing 4 William B. Rubenstein, Newberg on Class Actions § 12:18 (5th ed. 2011)).

Finding that the fee award accounts for a reasonable percentage of the total settlement does not end the inquiry.  To avoid unfair awards based on arbitrary percentages, common fund awards are further evaluated based on the reasonableness factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). *Camden I*, 946 F.2d at 775.  These factors include (1) the time and labor required to prosecute the case; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *Id.*

### A. *The Attorneys' Fee Award is a Reasonable Percentage of the Settlement Value.*

Common fund fee awards typically range from 20-30 percent of the total fund available, with a 25 percent benchmark adjusted for the individual circumstances of each case. *Id.* at 774-75; *Poertner*, 618 Fed. Appx. at 630 (calculating a reasonable percentage based on the total funds potentially available). Dr. Safir opines that a conservative estimate of the maximum Settlement value available is approximately $73.6 million, accounting for the total values of the cash payout option and the enhanced warranty.[24] Based on this estimate, the $9 million sought by Class Counsel accounts for approximately 12.2 percent of the Settlement's total potential value, which is well within the range approved by the Eleventh Circuit. *Camden I*, 946 F.2d at 774-75.

### B. *The Attorneys' Fees are Reasonable in Light of the* Johnson *Factors.*

*(1) Time and Labor; Contingency Arrangement.* Class Counsel has expended approximately 8,100 hours on this matter to date and anticipates an additional 250-500 hours on claims administration issues and potential appeals. [DE 195-1 at 1.] Prior to any settlement, Counsel deposed three Taurus representatives, reviewed 24,000 pages of Taurus documents, conducted over 500 hours of expert testing of Class Pistols, and spent over 90 hours in mediation. [DE 148 at 9-11.] Since settling, Counsel has prepared motions for preliminary and final approval, filed responses to 11 sets of objections from five objectors, and administered two rounds of notice. To date, Class Counsel has received no compensation for their efforts and will not be fully compensated for another three years. Given the amount of time and effort spent on this matter, as well as the risks of a contingency fee arrangement, the Court finds the requested

---

[24] Mr. Pennington objects to the $9 million fee award, arguing that it is excessive in light of the $30 million dollar Settlement value. [DE 141 at 5.] Mr. Pennington fails to account for the value of the enhanced warranty option, and thus undervalues the total value of the Settlement.

fee award to be reasonable.[25] *See Allapattah Services, Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1213 (S.D. Fla. 2006) (weighing the number of hours expended against the circumstances of the case in light of the court's own experience and expertise); *In re Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330, 1364 (S.D. Fla. 2011) ("A contingency fee arrangement often justifies an increase in the award of attorney's fees.").

**(2)  *Results Obtained*.** While the Settlement provides up to $76 million in relief to Taurus customers, it also addresses a public safety concern by removing potentially defective weapons from circulation.[26]  In addition, Class Counsel's expert testing persuaded Defendants to hire their own team to investigate the "drop-fire defect."  Defendants are working to develop a repair of this alleged defect, which, if feasible, would provide additional options for Class Members and greater safety for the public.  The Court recognizes the value this Settlement provides to Class Members and the public and accordingly weighs that in favor of Class Counsel's requested fee. *See Palmer v. Braun*, 2005 WL 3093409 at *5 (S.D. Fla. Nov. 18, 2005) (considering the non-monetary benefits achieved by counsel).

**(3)  *Counsel's Skill and Experience*.** Class Counsel's experience and skill also weigh in favor of the requested fee award.  Mr. Selby, Mr. Barrett and Mr. Snyder have extensive experience litigating complex class actions.  Mr. Wheeles has 13 years of expertise in products liability litigation, with a particular emphasis on litigating "drop-fire" cases against Taurus. [DE 148 at 10-11.]  Given the technical and political issues inherently involved in gun manufacturing cases, Class Counsel's talents combined to form the ideal legal team for this case. *See In re*

---

[25] Based on the expert report of Professor Charles Silver [DE 148-1] submitted by Class Counsel in support of their Motion for Attorneys' Fees, the Court also finds the award to be within the range of customary fees for class actions of this nature.

[26] Mr. Scheffler takes issue with the requested fee award based on his general dissatisfaction with the Settlement. [DE 162.]  The Court has determined that the Settlement is fair, adequate and reasonable and, therefore, overrules the objection.

*Checking*, 830 F.Supp.2d at 1363 (noting the level of legal talent necessary to prosecute complex cases); *see also Allapattah Services*, 454 F.Supp.2d at 1210 (allotting more weight to this factor than others). Their skills were only enhanced by those of opposing counsel, who were equally competent. *See Camden I*, 946 F.2d at 772 n.3 (considering the quality of opposing counsel). In court, counsel for both parties exhibited a high degree of professionalism, providing the Court with invaluable guidance on handgun engineering and the firearm manufacturing industry.

*(4) Undesirability; Time Limitations.* Class Counsel faced numerous risks by litigating against a foreign company—specifically, serving a foreign defendant [DE 30], obtaining discovery from that defendant [DE 101] and collecting a judgment in a foreign country. Firearms regulations presented an additional challenge. Class Counsel had to amend its Notice—and thereby delay final approval of the Settlement—so as to advise Class Members of state-imposed shipping restrictions. [DE 167.] Finally, the public safety concerns required timely action from Class Counsel and a swift resolution of this case.[27]

Considering all of the *Johnson* factors, the requested $9 million fee award in reasonable.

## VI.   Service Award

Class Counsel also requests Plaintiff Carter be granted a $15,000 service award to be paid separately by Defendants. [DE 148 at 2.] Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Allapattah Services*, 454 F.Supp.2d at 1218. Courts have consistently found such awards to be an efficient and productive way to encourage members of a class to become class representatives. *Gevaerts v. TD Bank*, 2015 WL 6751061, at *9 (S.D. Fla. Nov. 5, 2015). The factors for determining whether to grant a service award include: (1) the actions the class

---

[27] Counsel has filed a list of serious injuries that have occurred (both before and after settlement) as a result of an unintended discharge of a Class Pistol. [DE 191 at 5-6.]

representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation. *Id.* In light of the two-and-a-half years of service on behalf of the Class, involving, *inter alia*, assisting in the initial investigation, as well as sitting for depositions, other meetings with Class Counsel, and attending Court hearings, Plaintiff Chris P. Carter has earned a service award of $15,000 for representing the Class.[28] This service award is in addition to whatever optional benefits Plaintiff elects to receive pursuant to the Class Settlement. Therefore, it is hereby

ORDERED THAT

1)     Pursuant to Federal Rule of Civil Procedure 23, the Court finds that the Rule 23(a) and (b)(3) requirements have been satisfied. Therefore, the Court **CERTIFIES** the following Settlement Class:

> All Persons or entities of the United States, Commonwealth of Puerto Rico, U.S. Virgin Islands, and Guam who own one or more of the following Taurus-branded firearms on the date of preliminary approval: PT-111 Millennium; PT-132 Millennium; PT-138 Millennium; PT-140 Millennium; PT-145 Millennium; PT-745 Millennium; PT-609; PT-640; and PT-24/7.

> Excluded from the Settlement Class are all state, local or federal governments, bodies or agencies, the District Court Judge and Magistrate Judge to whom the lawsuit is assigned and any member of their staffs and immediate families, as well as all persons who validly request exclusion from the Settlement Class.

2)     Plaintiff's Motion For Final Approval of Class Action Settlement and Supporting Memorandum of Law [DE 147] is **GRANTED**. The Settlement is approved.

3)     Class Counsel's Motion for Attorneys' Fees, Costs, and Service Award [DE 148] is **GRANTED**. The fees are to be paid in three annual installments. In consideration for this

---

[28] Objector Pennington believes that Plaintiff does not deserve the requested award, arguing that Plaintiff has done "absolutely nothing for the class." Based on the discussion above, and the fact that Plaintiff filed this action, which led to this Settlement, Objector Pennington's statement is factually incorrect and his objection is overruled.

fee, Class Counsel shall continue to respond to Class Members' issues and questions, and assist in resolving issues with the claims administration process.

4) All Objections [DE 136, 137, 141, 142, 160, 164, 182, 184, 185, 186] are **OVERRULED**.

5) Mr. McAdams' Motion for Return of Property [DE 150] is **DENIED**.

6) The Joint Motion to Strike Objector Glaviano's Supplemental Objection [DE 194] is **GRANTED**.

7) Objector Glaviano's Supplemental Objection [DE 193] is **STRICKEN** from the record.

8) All other pending and stayed motions, including the Motion to Compel [DE 101], are **DENIED AS MOOT**.

9) This case is **DISMISSED WITH PREJUDICE**. This dismissal shall become effective upon the date the Settlement Agreement becomes final according to Paragraph II.A.11 of the Settlement Agreement.

10) In accordance with Paragraph IV.P.6 of the Settlement Agreement, the Court shall retain continuing and exclusive jurisdiction over the Settlement for all purposes, including its supervision, implementation, enforcement, and administration and for any disputes that may arise concerning the Settlement Agreement.

**DONE AND ORDERED** in Miami, Florida, this 22ⁿᵈ day of July, 2016.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record

# ATTACHMENT A

## CLAIM FORM

If you own a Taurus Class Pistol and wish to return it for a cash payment as part of the *Chris P. Carter v. Forjas Taurus S.A., Taurus International Manufacturing, Inc., and Taurus Holdings, Inc.* settlement, please fill out the following form completely and submit to:

Taurus Settlement Administrator
c/o Heffler Claims

P.O. Box 230
Philadelphia, PA 19102-0230

## To be eligible for a cash payment, this form must be postmarked by _____, 2016.*

(Please Print or Type)

| Settlement Class Member Name: | | |
|---|---|---|
| *First* | *M.I.* | *Last* |
| Address: | | |
| *Street* | *City* | *State*   *ZIP* |
| Phone Number: | | |
| Email Address: | | |

| Taurus Make: | Model: |
|---|---|
| Serial Number: | |

Additional Models. Please use the back of this form if you need more space.

| Taurus Make: | Taurus Make: |
|---|---|
| Model: | Model: |
| Serial Number: | Serial Number: |

\* You do not need to fill out and return this claim form to receive the Enhanced Lifetime Warranty (including free shipping) and Safety Training. Those benefits are automatic and do not require any action by you.

**Please review the Safety Training Video before packaging your Class Pistol.**

**Please also review the Shipping Check List.  You must comply with all warnings and instructions to properly disarm, store, package and ship your Class Pistol.**

**If you are returning three or more Class Pistols, please provide your social security number or taxpayer identification number so that you may receive a 1099 tax form if required.**

☐ ☐ ☐   ☐ ☐   ☐ ☐ ☐ ☐

**I hereby further confirm and acknowledge that:**

- I have had an opportunity to read the Notice and view the Safety Training Video.

- I (or the above named Settlement Class Member on whose behalf I am authorized to act) owned the above listed Taurus make(s) and model(s) on (Preliminary Approval Date).

I declare under the penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Dated: _____       Signed: _____

**CLAIMS MUST BE POST MARKED NO LATER THAN _____, 2016**